2024 IL App (2d) 230453-U
No. 2-23-0453
Order filed July 3, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 05-CF-2797 |
| AUGUSTINE T. MONTES, | ) ) | Honorable David P. Kliment, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court's order granting defendant a new trial following a third-stage postconviction hearing was not manifestly erroneous. Affirmed as modified and remanded for further proceedings.

¶ 2   Pursuant to section 122-1(f) of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(f) (West 2018)), defendant, Augustine T. Montes, filed a successive postconviction petition, alleging actual innocence. The trial court granted the State's second-stage motion to dismiss the petition but, on appeal, this court reversed in part and remanded for a third-stage evidentiary hearing on defendant's actual-innocence claim pertaining to his conviction for aggravated

discharge of a firearm and the sentencing enhancement for personally discharging a firearm. *People v. Montes*, 2023 IL App (2d) 210548-U. On remand, after an evidentiary hearing, the court vacated defendant's conviction for aggravated discharge of a firearm and ordered a new trial on that charge. The State appeals. For the following reasons, we affirm and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4                            A. Trial and Direct Appeal

¶ 5     This is the fourth appeal related to this case, but the first initiated by the State.[1] While some of the following information may be found in our prior decisions, it remains relevant to our resolution here. In sum, in 2010, after a trial *in absentia*, defendant was convicted of attempt first degree murder (720 ILCS 5/8-4(a), 9-1(a) (West 2004)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2004)). The jury also signed a special interrogatory, finding that defendant personally discharged the firearm. The court denied defendant's posttrial motions and sentenced him to 26 years' imprisonment for attempt murder, which included a 20-year enhancement for personally discharging a firearm (see 730 ILCS 5/5-8-1(d)(ii) (West 2004)), and a concurrent 10-year term for aggravated discharge of a firearm. Specifically, we note that, at the sentencing hearing, the State informed the court that, with respect to the attempt murder conviction, the required enhancement was at least 20 years, such that the minimum sentence for that charge would be "6 plus 20" and, therefore, "26 years." Thus, it requested that the court

---

[1]Defendant's three prior appeals were resolved in *People v. Montes*, 2013 IL App (2d) 111132 (direct appeal), *People v. Montes*, 2015 IL App (2d) 140485 (initial postconviction petition), and *People v. Montes*, 2023 IL App (2d) 210548-U (successive postconviction petition).

impose at least 26 years on the attempt murder conviction. Defense counsel confirmed that, because the court was "confined to the statute," the minimum for the attempt murder would be 26 years. In announcing its sentence, the court pointed out that 26 years on the attempt murder was the minimum, and "based on this is the first felony offense, I'm going to sentence you to 26 years" on the attempt murder.

¶ 6    Defendant timely appealed and this court rejected defendant's claims. See *People v. Montes*, 2013 IL App (2d) 111132, ¶¶ 1-48. A thorough recitation of the trial evidence may be found in that decision, however, we nevertheless note that, on November 22, 2005, Julian Ramos saw four people drive by him in a green Pontiac Bonneville. Ultimately, one person exited the vehicle and a gunshot was heard. Ramos, shaken, but not injured, initially told an officer that someone shot at him three or four times, although, at trial, he testified that there was only one gunshot. Ramos saw the person point a gun at him and heard a gunshot immediately thereafter.

¶ 7    Further, one of the vehicle's occupants, Blake Pannell, was acting as a government informant and recorded the event on a recording device he had been wearing. Pannell testified at trial on the State's behalf, in part explaining that defendant saw Ramos and believed him to be a rival gang member. Defendant left the vehicle with a gun, attempted to catch up with Ramos, but returned to the vehicle when Ramos fled. Defendant said that he knew where Ramos was heading, and he instructed the vehicle's driver to drive and park at another location where they could ambush Ramos when he arrived. In the meantime, defendant wiped the gun with a towel and threw it on the middle backseat. Pannell, who was sitting in the backseat, covertly removed the gun's ammunition clip, so no one would get killed, although he did not know if a bullet remained in the gun's chamber. After they arrived at the new location, defendant grabbed the gun and exited the vehicle. However, Ruben Hernandez, another vehicle occupant, appeared to notice that the clip

had been left behind. To avoid raising suspicion, Pannell left the car and ran after defendant with the clip. He testified that Ramos appeared, he saw defendant fire the weapon, and he heard a gunshot. When defendant returned to the car, he said, "I almost had him. I almost had him." Hernandez told defendant that, since he was seen, he better finish the job and kill Ramos, and they again began driving to find Ramos, with defendant planning to "just gun him down." As they neared a busy street, however, they saw Ramos had stopped traffic and was in the middle of an intersection with several vehicles were present, so they left and went to a friend's home. Pannell testified that defendant showered there, likely to remove any gunshot residue.

¶ 8 In addition, the State played for the jury a portion of Pannell's recording of the event. The recording included the sound of a gunshot, as well as defendant saying, "I had to bump that 'nigga,' " (which means kill him), "it was all over for him," "I was chasin', chasing down the block," and "I kept hearin' click, click, click," as well as defendant asking, after arriving at a friend's house, if he could take a quick shower.

¶ 9                    B. Initial Postconviction Petition

¶ 10 In 2014, defendant, through appointed counsel, filed a postconviction petition, alleging actual innocence, based upon entrapment, and two claims of ineffective assistance of trial counsel. The trial court summarily dismissed the petition, and we affirmed the dismissal. *People v. Montes*, 2015 IL App (2d) 140485. With respect to the claim of actual innocence premised on entrapment, defendant had alleged that evidence became available after trial that would have supported an entrapment defense. The relevant postconviction allegations were summarized in our prior decision (*id.* at ¶¶ 5-13); however, we note that defendant attached to his petition an affidavit from Hernandez, who alleged that Pannell, whom he knew as a gang "enforcer," had given defendant the gun, told defendant to act as a lookout for rival gangs, and was, essentially, the driving force

behind the shooting. Hernandez further summarized that, after defendant exited the vehicle with a gun, Pannell followed him with the clip of ammunition that had been left in the car. After both defendant and Pannell had left the vehicle, a single shot was fired, and Hernandez attested, "I didn't know if [defendant] fired the shot[.]"

¶ 11                                C. Successive Postconviction Petition

¶ 12    On April 15, 2019, defendant, again through counsel, moved for leave to file a successive postconviction petition, alleging two claims not at issue here and a claim of actual innocence. In support of his actual-innocence claim, defendant attached to the petition an affidavit from Jean-Marc Faison, dated May 15, 2018. In his affidavit, Faison attested that, on November 22, 2005, he was walking to a local liquor store when he saw defendant exit a green vehicle and run west between two houses. He also saw Ramos appear, and he was familiar with Ramos, as they were both gang members in the same neighborhood (different gangs, but not rivals). As he watched Ramos walking, Faison realized, based on defendant's "strange behavior" and attire (dressed primarily in black, with a hooded sweatshirt and bandana covering his face), that he might be a rival gang member. Faison explained:

> "As a gang member and resident of the area, I was familiar with the neighborhood and the violence that takes place in the area. Accordingly, I was carrying on my person a .38 revolver gun for protection. At the time, I was on parole for Aggravated Discharge of a Firearm and did not want to get caught in possession of a gun. With little police or gang investigator presence, due to the usual shift change at this time of day, I felt it was okay to have the gun without being caught. I began running west, towards Sumner Avenue, when I saw the individual [*i.e.*, defendant] come out from between the two houses just as [Ramos] was approaching. In fear for my safety and [Ramos's] safety, I took cover behind a parked

car and fired a single shot in the air. I fired the shot into the air to scare away the individual

I saw [*i.e.*, defendant] without injuring myself or [Ramos]. [Ramos] and I ran in opposite

directions after I fired the shot. I am not sure if the individual [*i.e.*, defendant] or [Ramos]

saw me there. The individual, [*i.e.*, defendant], did not fire a shot.

I did not provide this information at the time of the incident because I was on parole

and was afraid of the legal consequences and possible gang retaliation. At the time of this

incident, I was 19 years old and found it ironic that a Latin King took the fall for a shooting

he did not do. I learned through the newspaper and by word of mouth, that [defendant]

was charged and convicted for this shooting.

Now at 30 years old, having matured and having seen [defendant] in Menard

Correctional Center in 2015 for a shooting he did not commit, I feel great remorse for not

having come forward with this information. I have no love or loyalty toward any Latin

King; just the opposite. I make this statement because it is the right thing to do."

Faison further attested that his statement was given freely and voluntarily, with no threats,

promises, or anything offered in exchange for it.

¶ 13    As such, defendant argued in his petition that the above evidence was: (1) newly

discovered, as he did not know any of the information until he met Faison in 2015, while both

were serving sentences at Menard Correctional Center; (2) material, relevant, and probative of his

actual innocence, as it identified the shooter as someone else and established there was no intent

to harm Ramos and, thus, no attempt to murder him; and (3) likely to change the trial outcome. In

addition, in an affidavit dated March 27, 2019, and attached to the motion for leave to file the

successive petition, defendant attested,

"I had no knowledge of the information contained in Jean-Marc Faison's affidavit until I met him while we were both incarcerated at Menard Correctional Center. In addition, I did not fire the shot I am accused of firing. I do not know who did fire that shot, or where it came from."

¶ 14 On October 23, 2019, the trial court granted defendant leave to file his successive petition, which the State later moved to dismiss. On October 6, 2021, the court granted the State's motion to dismiss. As to the actual-innocence claim, the court noted that it could not, at the second stage, assess the credibility of Faison's affidavit. However, it found that, when considered along with all evidence in the case, the information in the affidavit would not change the result on retrial. It noted that "the case against defendant was strong. Portions of the events were preserved on audio tape and played for the jury." Further, the court noted that the record supported that defendant fired the weapon and, therefore, whether Faison may have "also" fired a weapon was of no relevance.

¶ 15 On appeal, defendant argued that a third-stage evidentiary hearing was warranted because nothing in the record rebutted the newly discovered evidence, which would likely change the result at trial. With respect to defendant's attempt first degree murder conviction, this court disagreed. Specifically, we determined that there was significant evidence that defendant attempted to murder Ramos and, therefore, whether Faison also fired a weapon was not relevant to that charge. *Montes*, 2023 IL App (2d) 210548-U, ¶ 25. We noted that the evidence that defendant pointed a weapon at Ramos and fired it, whether it was loaded or not, or was loaded and misfired, was strong and, along with other evidence, reflected that defendant performed an act that constituted a substantial step toward killing Ramos and that he intended to kill Ramos. *Id*. ¶¶ 25-27.

¶ 16    However, we determined that Faison's affidavit cut against defendant's conviction for aggravated discharge of a firearm, as well as the finding that he personally discharged a firearm, which qualified him for the 20-year sentencing enhancement. *Id.* ¶ 28. Specifically, we noted that those allegations required defendant's actions to have forcefully discharged ammunition from the firearm. *Id.* We noted further that Faison testified that he fired a gun and that defendant did not, and defendant argued that the evidence established that only one gunshot was actually heard. *Id.* ¶ 29. If defendant pulled the trigger but no ammunition was forcefully expelled from the firearm and, instead, Faison was the person who fired that shot, we agreed that a factfinder could reach a different result on the aggravated discharge of a firearm count, as well as its finding that defendant "personally discharged a firearm," which mandated a sentencing enhancement. *Id.* We determined that, regardless of whether the evidence reflected one shot or multiple shots, close in time—*i.e.*, that both Faison and defendant fired a weapon—surely that information would have been at least *relevant* to the jury when deliberating on the aggravated-discharge count and when making a finding that defendant personally discharged the firearm. *Id.* Accordingly, with respect to the aggravated-discharge conviction and firearm enhancement, we concluded that the court incorrectly dismissed the petition on the basis that the evidence was not of such conclusive nature that it would probably change the result on retrial. *Id.* ¶ 30. We noted, however, that while Faison's story about the warning shot could eventually fall apart, the evaluation of his credibility was not before us, as "credibility determinations are made at a third-stage evidentiary hearing." *Id.* (quoting *People v. Robinson*, 2020 IL 123849, ¶ 81 (citing *Sanders*, 2016 IL 118123, ¶¶ 33, 42)). Nevertheless, we concluded that, with respect to his conviction for aggravated discharge of a firearm and the finding that he personally discharged a firearm, resulting in a sentencing enhancement, defendant made a substantial showing to justify a third-stage hearing because, "at

this juncture, the conclusion that the information in Faison's affidavit reasonably could have impacted those verdicts is simply inescapable." *Id.* We determined, "Faison's affidavit unquestionably casts in a different light the trial evidence with respect to that charge and finding and undermines our confidence in the verdict on defendant's conviction for aggravated discharge and on the firearm enhancement," and we reversed the trial court to allow defendant's actual-innocence claim, with respect to his aggravated-discharge conviction and the personal-discharge enhancement, to proceed to an evidentiary hearing. *Id.*

¶ 17                          D. Third-Stage Evidentiary Hearing

¶ 18                               i. Faison's Testimony

¶ 19    On June 28, 2023, the court held a third-stage evidentiary hearing. Faison testified that he is 37 years old and that he previously provided the affidavit attached to defendant's petition. He proceeded to testify to the events as described in his affidavit, including that, on November 22, 2005, he was walking to a liquor store in Aurora, when he saw a car with multiple people in it pull up and someone (whom he later learned was defendant) jump out and start heading towards Sumner Street. He then noticed Ramos also near Sumner. Faison explained that he "knew of" Ramos and recognized him because he had seen him a few times at parties or walking in the neighborhood. Faison acknowledged that, in 2005, he was a member of the Gangster Disciples street gang, and testified that Ramos was a member of the Insane Deuces, an affiliated gang. Faison, who was on parole at the time, crouched down near a car and shot his gun in the air one time. He explained he knew the person who got out of the car (*i.e.*, defendant) was "up to something, so I wanted to fire a shot to scare them away and I did." He explained that firing the shot was "pretty much called security. It's a natural instinct because it's kill or be killed sometimes in that neighborhood[.]" Faison testified that only one shot was fired, he was the one who fired it,

and that he did not see defendant fire a gun. Faison then ran away and did not report the incident to the police because he was on parole and there was no reason to report it. However, in 2015, he met defendant at Menard Correctional Center. Faison and defendant started talking and, when he learned why defendant was incarcerated, he realized that defendant was "locked up for something I did." Faison agreed to provide defendant a signed, notarized affidavit, and reiterated that no one forced him, paid him, or influenced him in any way to provide it. Although he learned that defendant was a member of the Latin Kings, an enemy or rival gang of the Gangster Disciples, Faison was no longer a member of the Gangster Disciples in 2018, when he signed the affidavit. He explained, "I had nothing to gain besides on a personal level karma. I got locked up for something I didn't do on the crime that I was in Menard for and I look at that as a sign to try to make things right."

¶ 20 On cross-examination, Faison testified that he was incarcerated due to his conviction for attempt murder and aggravated kidnapping, crimes he testified that he did not commit. Although he claimed to be wrongly convicted, Faison disagreed that he had a "bad taste in his mouth" for the criminal justice system or the Kane County State's Attorney's office. He agreed that he broke the law while carrying a weapon on November 22, 2005, as he was, at that time, on parole for aggravated discharge of a firearm. When asked why he felt the need to take cover when he fired the shot, Faison answered, "just in case somebody was shooting back." He did not see anybody with a gun, but he did not want to be seen and did not want to get shot. Faison confirmed that he did not see defendant with a gun. Faison explained he did not contact police or fill out an affidavit earlier, because he "grew up" and "prison taught me something." Faison testified that he had contact with defendant a few times while they were incarcerated together, but he did not see police reports from the case or ever read the appellate court opinions regarding it. He agreed that the

Insane Deuces and Gangster Disciples are affiliated "folk nation" gangs, while the Latin Kings are a rival "people nation" gang. The State asked Faison how the Gangster Disciples would react if they learned he was testifying on behalf of a rival gang member, and he explained, "I am beyond that. I am 37 years old. I don't—that doesn't work in my world today."

¶ 21    On re-direct, defense counsel reviewed the details of how the affidavit was created, confirming with Faison that, when defense counsel and Faison spoke about the contents of the affidavit, counsel had asked Faison whether anyone had threatened, paid, or promised him anything in exchange for the affidavit and counsel told Faison that if any of those things were true, he did not want to talk with him. Faison again testified that the contents of the affidavit and his testimony before the court were true. Counsel asked Faison to expand upon his comment that he grew up and prison taught him something, and he replied,

> "Well, I know what some people go through in prison and how horrible [it is] to be in prison, period, but let alone for something that you didn't do because, like I say, for my case I am wrongfully convicted and I just thought maybe it was just karma and I wanted to make it right."

In addition, he explained that how gang members would react to his testimony was not part of his world anymore, because he stopped "gangbanging" "years ago," he is 37 years old, and it does not matter to him that 18 years ago defendant was a member of the Latin Kings.

¶ 22    The State moved for a directed finding. In doing so, the State reminded the court that, at a third-stage hearing, "this Court has wide discretion in deciding what evidence to consider because this Court is the finder of fact[ ]. This Court is going to resolve any conflicts in the evidence and this Court gets to determine the credibility of witnesses now that we're at Stage 3 and what weight, if any, to be given to their testimony." The State argued extensively that Faison was not credible,

essentially asserting that it was not credible to believe that a gang member such as Faison would submit an affidavit and be willing to testify and implicate himself in a crime that he committed, but for which a rival gang member was convicted and sentenced to prison. Moreover, the State described as "laughable" the notion that Faison would care if a rival gang member was convicted and sentenced for a crime that Faison committed. Finally, the State pointed to trial evidence that it purported rendered weak the affidavit. The court ultimately denied the motion for directed finding.

¶ 23                          ii. Officer Manuel Cuevas-Escobedo

¶ 24    The State called Aurora police officer Manuel Cuevas-Escobedo to testify as a gang expert. Cuevas-Escobedo explained that he is 30 years old and was recently found qualified as a gang expert in one other case. He has been with the Aurora police department for 3.5 years, part of the gang special operations unit for 1.5 years, and he testified that he searched databases to become familiar with the gang climate in Aurora in 2005. Cuevas-Escobedo confirmed Faison's statement that the Insane Deuces (Ramos) and Gangster Disciples (Faison) are affiliated gangs under the folk nation; in fact, because of that, they can co-exist and have been housed together in jail. As allies, they are expected to protect each other. Both gangs, however, especially the Insane Deuces, are enemies of the Latin Kings (defendant). Given that folk nation gangs and people nation gangs have been at war, specifically, in Aurora, for the last 40 or 50 years, Cuevas-Escobedo testified that he would be "shocked" to learn that a Gangster Disciple would admit to something for which a Latin King, a rival gang member, had been convicted. In reality, Cuevas-Escobedo testified, he would have expected Faison and members of the Gangster Disciples to ecstatically celebrate and brag about the fact that a Latin King took the fall for something that he did. When asked what the Gangster Disciples would do upon learning that Faison had submitted this affidavit, he said it

"depends" and Faison could be "violated" (*i.e.*, beaten). Again, Cuevas-Escobedo explained that the situation was "shocking" and he believed something else was going on,

> "something internal, something that we are not seeing. It's either maybe Mr. Faison could be threatened *** would think that maybe that person was being threatened or paid off, some type of monetary gain whether that be, you know, his status. He is incarcerated; right? It could be—put money on his books, put money on his commissary, some type of a financial gain or some type of either harassment or threat. That's the only thing in my opinion that I could see happening."

When asked whether he would expect that Faison's testimony was motivated by it being the right thing to do, he replied, "[a]bsolutely not."

¶ 25    On cross-examination, however, Cuevas-Escobedo admitted that he had never met Faison, did not know him in 2005, and does not know him now as a 37-year-old man. When he did his research, he checked Faison's corrections records to ascertain whether Faison was involved in recent gang activity. However, he agreed that he had "no idea" and there was nothing reflecting that Faison was currently involved in a gang. Cuevas-Escobedo agreed that allied gangs are expected to protect each other, and, so, Faison's testimony about shooting in the air to protect an ally (*i.e.*, Ramos) would be behavior consistent with gangs protecting allies and, if true, could make sense. Moreover, Cuevas-Escobedo agreed that some gang members go to prison when they are young and, then, when they are released, they are the same; however, other gang members who go to prison while young mature upon release and want nothing to do with gangs. He agreed that he does not know Faison at all, what happened to him in jail, or whether, at age 37, Faison is a person who has gained maturity and morality.

¶ 26    Upon questioning by the court, Cuevas-Escobedo confirmed that he searched 2005 police records and, at that time, when Faison was age 19, the records did not list him as a Gangster Disciple, but they did identify Ramos as an Insane Deuce and defendant as a Latin King.

¶ 27                              iii. Argument and Court's Ruling

¶ 28    On September 29, 2023, the court heard final arguments.  Defendant's attorney, in part, reminded the court that the case clearly depended on an analysis of Faison's credibility.  He argued that the fact that Faison was testifying in favor of an opposing gang made the credibility of his statement *stronger*, not weaker.  Moreover, counsel noted that, while one could speculate about other motives, there had been no evidence to demonstrate Faison was receiving any benefit in exchange for his testimony.

¶ 29    The State, in sum, emphasized that our decision remanding the case for an evidentiary hearing was issued in the context of stage two, which prohibited this court from assessing witness credibility and, further, that we had not done so.  However, now the case was at stage three.  The State challenged Faison's credibility in terms of the other trial evidence, as well as his motivation, asking, "what is Faison's *quid pro quo*, what does he get out of this[?]"  The State suggested that, despite his claim that he had no animosity toward the police or State, Faison believes that he was wrongfully convicted and,

> "[w]hat better way to wreak havoc and get some kind of revenge against the prosecutor's office who put him there, the police department that did the investigation that led to the charges that put him there than to wreak havoc and get some kind of revenge, you're going to throw as many wrenches into the State's criminal cases as you can so he can halt the wheels of justice from turning.  What Jean-Marc Faison did by testifying the way he did in this case, Judge, I'll say it goes beyond incredulous.  I'll say it's perjurious.

He gave the ultimate middle finger to the police and to the prosecutors because from his own mouth he was wrongfully convicted and he's doing 40 years. His mentality is if you want to wrongfully convict me and take me out of circulation for 40 years, then I'm going to do everything in my power to tamper with convictions, to tamper with sentences of other people to make your lives a living hell."

¶ 30 Defense counsel replied that there was no evidence of this alleged motive and,

"[i]t is only gross speculation to believe that Mr. Faison, who your Honor saw on the witness stand, who was not a hateful individual, who did not express hate or any kind of dislike of anybody in the courtroom, it is gross speculation to say well, he made an exception to his usual rule that he's not going to testify for another gang member so that he can basically screw over the Aurora Police Department and the Kane County State's Attorney's Office. I think the fact that the State has to stretch to reach that conclusion shows that there was power to the argument that Mr. Faison would not have testified in the manner that he did, being an opposing gang member, unless it was true."

Counsel also reminded the court that credibility was clearly the court's determination to make at this stage, based on the testimony and the evidence reviewed.

¶ 31 The court granted defendant's petition. It explained that it had reviewed its notes, the record, this court's recent decision, as well as the relevant petitions and motions. It explained,

"*The issue before me is Mr. Faison's credibility and how, if I find him credible, that could affect the outcome of a new trial*. Reading the record in this case, one of the key witnesses for the State was an individual named Blake Pannell who was a government informant. Throughout the record his credibility was at issue because of the nature of his testimony, work and so forth. He testified, and it's in the Appellate Court opinion, that he

covertly removed—and this is what the Appellate Court stated, it's not what Mr. Pannell said.  I don't think he probably said the word covertly.  But, he claimed to have removed the gun's ammunition clip so no one would get hurt, although *he did not know if a bullet remained in the gun's chamber. That's important*. Pannell left the car, ran after the defendant with the clip.  He testified Ramos appeared.  He saw the defendant fire the weapon and he heard a gunshot. Then there's the testimony I almost had him, it was all over for him, I was chasing him, was chasing him down the block—and *this is important— I kept hearing click, click, click*.  This is from a recording on a wire that Blake Pannell was wearing.  I kept hearing a click, click, click.  *The defendant never said that he fired a shot*." (Emphases added.)

¶ 32   The court further noted that, in his affidavit, Faison said that he observed this as it was happening, he fired a shot, and there was evidence at trial that only one shot was heard.  According to the court,

"The Appellate Court in their opinion on Page 15, 'Faison's affidavit cuts against defendant's conviction for aggravated discharge of a firearm, as well as the finding that he personally discharged a firearm, which qualified him for the add-on. Surely, that information would have'—that he fired a shot, Faison, would have been 'at least relevant to a jury when deliberating on the aggravated discharge count and when making a finding that the defendant personally discharged a firearm.'

*So, it all hinges on Faison's credibility, and I will say while I think there are a lot of problems with his affidavit and what he testified to and so forth, I cannot say that his credibility is so poor that a jury is not entitled to hear what he has to say.*

So, I'm going to grant this petition. I'm going to order a new trial on what I think is Count 3 in this case, which is the aggravated discharge of a firearm count. This decision does not in any way impact the attempt murder conviction. The Appellate Court covered that. Only the agg discharge." (Emphases added.)

¶ 33    The State appeals.

¶ 34                                    II. ANALYSIS

¶ 35    The Act (725 ILCS 5/122-1 *et seq.* (West 2020)) "provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated in his original trial or sentencing hearing." *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). A postconviction proceeding allows inquiry only into constitutional issues that were not and could not have been adjudicated on direct appeal. *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009). Such violations include freestanding claims of actual innocence, based on newly-discovered evidence. *People v. Brown*, 2013 IL App (1st) 091009, ¶ 50.

¶ 36    The Act establishes a three-stage process for the adjudication of a postconviction petition (*People v. English*, 2013 IL 112890, ¶ 23) and, here, the court performed a third-stage evidentiary hearing on defendant's claim of actual innocence, the ultimate purpose of which was to determine whether the new evidence was of such conclusive character that it would probably change the result on retrial (*Robinson*, 2020 IL 123849, ¶¶ 47-48; *People v. Carter*, 2013 IL App (2d) 110703, ¶ 77). To make this determination, the trial court was required to assess the credibility of Faison and other witnesses. *Id.* More specifically, at a third-stage hearing, "the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34. Ultimately, a new trial is warranted if all facts and surrounding

circumstances, including the new evidence, warrant closer scrutiny to determine the guilt or innocence of the defendant. *Robinson*, 2020 IL 123849, ¶¶ 48, 56; *Carter*, 2013 IL App (2d) 110703, ¶ 75.

¶ 37    Notably here, "[a]fter an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous." *English*, 2013 IL 112890, ¶ 23.  Specifically, because the post-conviction judge was able to observe and hear the witnesses at the evidentiary hearing, he or she occupies a "position of advantage in a search for the truth" that "is infinitely superior to that of a tribunal where the sole guide is the printed record." *People v. Coleman*, 183 Ill. 2d 366, 384 (1998).  As such, " 'unless something appears to show that the determination by the trial judge was manifestly erroneous, the [credibility determinations made by the] trial judge, who had an opportunity to see and hear each witness[,] will be upheld.' " *Id.* (quoting *People v. Bracey*, 51 Ill. 2d 514, 517 (1972)).  "Manifest error" is error which is "clearly plain, evident, and indisputable." *People v. Taylor*, 237 Ill. 2d 356, 373 (2010).

¶ 38                    A. Decision Not Manifestly Erroneous

¶ 39    The State argues first that the court's decision to vacate the aggravated-discharge-of-a-firearm conviction and remand for a new trial was manifestly erroneous.  It argues that the court applied the wrong standard because, where it did not find that Faison was credible and his testimony was of such conclusive character it would probably change the result on retrial, the court apparently applied only a second-stage standard and assumed the testimony was true, unless rebutted by the record.  In particular, the State takes issue with the judge's statement that, "I will say while I think there are a lot of problems with [Faison's] affidavit and what he testified to and so forth, I cannot say that his credibility is so poor that a jury is not entitled to hear what he has to

say." According to the State, the court's statement reflects it applied a standard contrary to this court's holding in *Carter* and, further, that the statement was "clearly tantamount to finding that Faison was not credible." For the following reasons, we disagree.

¶ 40   In *Carter*, following an evidentiary hearing, the postconviction court denied the defendant's petition. *Id.* ¶ 2. On appeal, the defendant argued that the court had improperly usurped the role of the jury by finding not credible one of the witnesses at the hearing. *Id.* ¶ 73. The defendant argued that the court's task, at most, was to make only a preliminary determination of whether a reasonable fact finder could believe the witness at a new trial. *Id.* ¶ 78. We disagreed, reiterating that the court at a third-stage evidentiary hearing must determine whether the new evidence was of such conclusive character that it would probably change the result on retrial and, in order to make that determination, the court was required to assess witness credibility. *Id.* ¶ 77. We held that the court had not exceeded its bounds by discrediting one witness's testimony and crediting another; "[i]ndeed, the trial court's role, in determining whether defendant was entitled to a new trial after the evidentiary hearing, was to weigh the witnesses' testimony, make credibility determinations, and resolve conflicts in the evidence." *Id.* Moreover, we referenced as instructive *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1036 (2011), which we explained had reasoned that, "although new evidence need not necessarily establish the defendant's *innocence*, it must establish a *basis for closer scrutiny* of the defendant's guilt." (Emphasis added.) *Id.* ¶ 84.

¶ 41   Here, the State mischaracterizes the court's decision as one applying the standard urged by the defendant and rejected by the court in *Carter*. The defendant's complaint in *Carter* was that the court made credibility findings; here, defendant makes no such claim and, further, the record clearly reflects that the court was aware that its role at the third-stage evidentiary hearing was to make credibility findings. As noted above, on multiple occasions, the attorneys reminded the court

of its role as fact finder. Further, the court announced when ruling that the issue came down to Faison's credibility and, specifically, that "[t]he issue before me is Mr. Faison's credibility and how, if I find him credible, that could affect the outcome of a new trial." This statement, which preceded the statement challenged by the State, reflects that, in full context, the court knew the law and applied the correct standard. Moreover, while the court noted that there were problems with Faison's affidavit and testimony, we disagree that this statement equates to a finding that he was *not* credible or reflects the application of an incorrect standard. To the contrary, we read the court's statement, particularly when combined with its decision to remand for a new trial, as an expression that, even if imperfect, Faison's testimony was credible. In fact, we read the court's statement as a different way of saying the standard as explained in *Carter* (and previously expressed in *Gonzalez*); namely, that, although the new evidence did not necessarily establish defendant's innocence, Faison's testimony met the bar of establishing a basis for closer scrutiny of defendant's guilt. *Id.* ¶ 84. We note that, at the evidentiary hearing, when deciding whether to grant relief, the court is not tasked with redeciding the defendant's guilt because, if it were, the remedy would be an acquittal, not a new trial. *Coleman*, 2013 IL 113307, ¶ 97 (citing *Molstad*, 101 Ill. 2d at 136 ("this does not mean that [the defendant] is innocent, merely that all of the facts and surrounding circumstances *** should be scrutinized more closely to determine [his] guilt or innocence")). Moreover, "[p]robability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.* Here, the court's reference to Faison's credibility as being not so poor that a jury should not hear it, conversely means that he *was* sufficiently credible that a jury *should* consider his testimony. The court did not apply an improper standard. In total, given that the court was aware of the proper standard, reviewed its notes, the evidence, the record, and the appellate court decision, found

important several pieces of trial evidence as they related to Faison's testimony, and found that Faison's credibility was sufficient for a new trial, it inherently decided the evidence was of such a conclusive character that it could change the result on retrial.

¶ 42    The State further contends that the trial court's recitation of this court's analysis at the evidentiary hearing reflects it unintentionally applied an incorrect standard by parroting our decision, which had merely applied a second-stage review and, in fact, had noted that Faison's testimony could fall apart.  Again, we disagree.  While the court did not use the specific words that Faison's testimony was so conclusive that it would probably change the result on retrial, the court's summary of the pertinent evidence from trial, how Faison's testimony implicated that evidence, and its finding (in full context) that Faison's credibility was before it and warranted review by a jury, does not reflect that the court committed clearly plain, evident, and indisputable error by applying the wrong standard in evaluating the evidence.

¶ 43    The State also contends that, while the court did not list the "problems" it found with Faison's affidavit and testimony, there were several reasons it *could* have found his credibility lacking, as there were significant inconsistencies between his testimony and the trial evidence, which demonstrate that he was not credible and that defendant fired the gun. For example, the State notes that: (1) Faison testified that defendant wore a black hoodie, while the victim had testified that he was primarily dressed in black with a white, hooded sweatshirt; (2) Faison's affidavit and testimony did not indicate that he heard Ramos yell certain statements as he ran from the scene, which he would have heard, had he actually been there; (3) Faison did not indicate that he also saw Panell, who had exited the car; (4) Faison testified that he realized from defendant's attire and strange behavior that he might be a Latin King, but he did not testify to seeing gang signs or any other observations that would support that assumption and, thus, "Faison's claim that he

was [*sic*] fired a shot into the air for his and Ramos' safety is *utterly ridiculous* under these facts" (emphasis added.); and (5) Faison's testimony implicitly contradicts his affidavit because his affidavit noted that defendant did not fire a shot whereas, at the hearing, he testified he did not see defendant with a gun. At oral argument before this court, the State also highlighted that the transcript recovered from Pannell's device did not record the vehicle passengers reacting to a gunshot heard coming from another location; accordingly, the State suggests, the absence of any such reaction renders less credible Faison's story. Finally, the State summarizes in detail the trial evidence supporting that defendant actually fired a shot at Ramos (*e.g.*, Ramos saw defendant raise a gun and heard a gunshot right away, defendant took a shower to get rid of gunshot residue), further asserting it is highly relevant that, in granting the second-stage motion to dismiss, the postconviction court had found that the record fully supported the fact that defendant fired the weapon and that we previously held that the evidence, viewed in the State's favor, was sufficient to uphold the jury's finding that defendant shot at Ramos. *Montes*, 2013 IL App (2d) 111132, ¶ 78.

¶ 44 Preliminarily, many of the State's challenges to the details of Faison's testimony and the alleged inconsistencies with trial evidence (which are not necessarily completely accurate[2]) or the

---

[2]As defendant notes in his brief at pages 31-32, for example, at trial, Officer Hornbeck testified that Ramos told him defendant wore primarily black and a white, hooded sweatshirt, but Ramos testified multiple times at trial (consistent with Faison's testimony) that defendant wore a black, hooded sweatshirt and the driver wore a white, hooded sweatshirt. Further, as defendant notes, the fact that Faison did not volunteer additional information that no one asked him about does not necessarily impact his credibility. As to it being "utterly ridiculous" that Faison might

absence thereof are appropriate questions for cross-examination. Further, the State's focus on the trial evidence, the court's second-stage finding that the evidence supported that defendant fired the weapon, and our decision on direct appeal, is misplaced. Although the trial evidence supported defendant's conviction for aggravated discharge of a firearm, based upon what was known at the time, the *newly-discovered* evidence, which the court has now found sufficiently credible, casts that trial evidence in a new light and warrants closer scrutiny of defendant's guilt with respect to that conviction. Specifically, and as explained in our most recent decision, even if the evidence supported that defendant acted to fire a weapon, the critical question for the aggravated-discharge conviction is whether that weapon forcefully expelled ammunition. *Montes*, 2023 IL App (2d) 210548-U, ¶¶ 28-29. As such, Faison's testimony implicates that conviction because, and as the court expressly found "important" in its findings, there was trial evidence that only one gunshot was heard, defendant was recorded saying he only heard "click, click, click," and Faison testified that *he* was the person who fired that gunshot. The newly-discovered evidence, if believed by the jury, would be so conclusive as to probably change the result on retrial for the aggravated-discharge conviction.

---

have felt something suspicious was afoot without seeing defendant throw gang signs, Ramos also felt something suspicious was happening and linked it to gang activity, and such intuition might not necessarily be ridiculous given the life experience of gang members. Finally, the vehicle occupants might have assumed that any gunshot they heard came from defendant, so the absence of commentary on the transcript about hearing a gunshot fired from another location does not necessarily reflect Faison's testimony lacked credibility. In other words, none of these purported discrepancies demonstrate that the trial court committed clear, evident, and indisputable error.

¶ 45 The State also references Cuevas-Escobedo's testimony that Faison's testimony was shocking and was likely motivated by some sort of financial gain. To the extent that the court gave Cuevas-Escobedo's testimony less weight than Faison's, that determination was not plain, evident, or indisputably erroneous. To the contrary, much of Cuevas-Escobedo's testimony about Faison's motives for testifying constituted speculation. While he offered his expert opinion, given his experience as a special operations unit officer, that opinion was not supported by any evidence specific to Faison. For example, he testified he did not know Faison and had not spoken to him, nor did he have any evidence that Faison remained active in a gang or received any financial benefit in exchange for his testimony. Moreover, Cuevas-Escobedo acknowledged that Faison's testimony about shooting in the air to protect an allied gang member made sense, if true, as gangs are expected to protect allied gang members. He further agreed that some gang members mature while in prison. Perhaps because there was no evidence supporting the possible motive suggested by Cuevas-Escobedo, the State in closing argument shifted gears and engaged in rampant speculation that Faison's motive was instead to "wreak havoc" and make the lives of State workers "living hell" because he believed he was wrongfully convicted. Again, there was no evidence at the hearing to support that argument, which also, we note, seems to contradict its own witness's testimony that there is no reason why Faison would testify in a manner that would assist a former rival gang member. We note that while we are not unsympathetic to the State's comment at oral argument that motives can be hard to establish, it remains that the court here was tasked with weighing the credibility of the evidence and, given the evidence presented, we cannot find it obviously erred in doing so here.

¶ 46 In short, the standard of review, which is always of utmost importance, particularly controls our decision here. Indeed, manifest-error review does not permit us to substitute our judgment for

that of the trial court, simply because we might have held differently. See, *e.g*, *People v. Breedlove*, 2015 IL App (3d) 140571-U, ¶ 41 (we review the trial court's factual findings and credibility determinations regarding a third-stage postconviction petition for manifest error, "[w]e may not substitute our judgment for that of the trial court, and we will not reverse its decision unless it is clearly evident, plain, and indisputable that the decision was erroneous."). Where the postconviction judge here observed the witnesses and was in a position "infinitely superior" to ours (*Coleman*, 183 Ill. 2d at 384), we simply find no basis for upsetting the court's evaluation of witness credibility or for otherwise finding plain, evident, or indisputable error. We again note that the conclusive-character element of an actual-innocence claim does not require the new evidence be entirely dispositive; rather, it requires only that the evidence place the trial evidence in a different light and undermine the court's confidence in the judgment of guilt. See *Coleman*, 2013 IL 113307, ¶ 97; *Robinson*, 2020 IL 123849, ¶¶ 55-56. The court did not apply an incorrect legal standard or otherwise manifestly err in granting defendant a new trial on the aggravated-discharge-of-a-firearm conviction.

¶ 47                    B. Personal Discharge of Firearm

¶ 48    Next, the State argues that the court manifestly erred where it did not follow our mandate and address the issue whether defendant personally discharged the firearm and when it commented that its decision did not in any way impact the attempt-murder conviction. The State concedes that, technically, the court was correct that the attempt-murder *conviction* is not impacted, but it asserts that the attempt-murder *sentence* is implicated because defendant's 26-year sentence for attempt murder included a 20-year enhancement for personally discharging the firearm. The State asserts that we should remand with instructions for the court to address how the jury's special finding impacted defendant's sentence for attempt murder. It also asserts that, at the sentencing

hearing, there was only limited reference to the 20-year enhancement and "no discussion or recommendation revealed in the record that defendant should be sentenced to a certain amount of years plus the enhancement," the prosecutor noted only that the minimum sentence for attempt murder was 6 years and the enhancement raised that minimum to 26 years, and it would be "purely speculative to assume that the trial judge would have sentenced the defendant to anything less than 26 years, regardless of the enhancement, as the sentence imposed was within the range for attempt[ ] murder without any enhancement." The State notes that this court's recent decision in *People v. Vatamaniuc*, 2023 IL App (2d) 210665-U, ¶ 46, explained that a defendant can be sentenced to any term within the appropriate range on remand, as long as it is not *increased*. Accordingly, the State contends, if a new sentencing hearing becomes necessary, defendant may be sentenced between 6 to 26 years. The State contends that requesting a new sentencing hearing is premature, but that we should remand for the court to make a finding whether the evidence is sufficient to establish that defendant personally discharged a firearm.

¶ 49 Defendant agrees with the State that the same evidence and arguments apply to the firearm enhancement as apply to the aggravated-discharge-of-a-firearm conviction. He agrees that the court failed to follow this court's mandate by not specifically addressing the firearm enhancement. However, he does not agree that we need to remand the matter to the court, because logic dictates that the court's determination that Faison's testimony was sufficiently credible and likely to alter the result of the aggravated-discharge conviction on retrial applies with equal force to the personal-discharge enhancement and, thus, we need not remand for a separate determination on that enhancement. As such, defendant asserts that we should use our authority under Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967) to simply modify the judgment to grant him a new trial on the finding that he personally discharged a firearm. Alternatively, if we elect not to exercise our

authority under Rule 615(b), defendant agrees we should remand for a new trial on the finding that he personally discharged a firearm.

¶ 50    The parties are correct that courts on remand must follow directions contained in a reviewing court's mandate. *People v. Payne*, 2018 IL App (3d) 160105, ¶ 9. Here, the court acknowledged that our decision remanded for an evidentiary hearing on defendant's actual-innocence claim, with respect to his aggravated-discharge conviction and the personal-discharge enhancement (see *Montes*, 2023 IL App (2d) 210548-U, ¶ 30), but it did not specifically reference the personal-discharge enhancement in its final order. We suspect this was a combination of oversight and the fact that, as the parties both acknowledge, the court found at the hearing that Faison's testimony warranted a new trial with respect to whether defendant discharged a firearm and, so, the two "discharge" considerations overlap, such that the court *implicitly* also vacated the special finding when it vacated the aggravated discharge conviction. Indeed, the court noted that its decision did not impact the attempt-murder *conviction*, but only the aggravated-discharge conviction and as explained by this court in our decision, which, of course, had also explained the impact that Faison's testimony had on the personal-discharge finding. In any event, the parties are correct that the issue must be addressed.

¶ 51    In keeping with our authority to modify judgments under Rule 615(b)(1), we order that, at defendant's new trial for aggravated discharge of a firearm, the jury must also be asked to determine whether defendant personally discharged a firearm. Hypothetically, as they are based on the same evidence, the jury's findings on the two issues must be consistent. If the jury reconvicts defendant on aggravated discharge and again finds that defendant personally discharged a firearm, the original attempt-murder conviction remains intact. If, however, the jury acquits defendant and finds defendant did *not* personally discharge a firearm, then a new sentencing

hearing on the attempt-murder conviction must be held. Similarly, if, again hypothetically, the State decides not to re-try defendant on the aggravated-discharge count, then, because the court implicitly vacated the special finding, a new sentencing hearing must be held on the attempt-murder conviction.

¶ 52                    III. CONCLUSION

¶ 53     For the reasons stated, the circuit court of Kane County is affirmed as modified, and the cause is remanded for further proceedings.

¶ 54     Affirmed as modified; cause remanded.