2025 IL App (1st) 240655-U

No. 1-24-0655

Order filed March 31, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 22374 |
| | ) | |
| EDWARD PLEASANT, | ) | The Honorable |
| | ) | Jennifer F. Coleman, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justice Cobbs concurred in the judgment.
Justice Pucinski dissented.

ORDER

¶ 1    Following a third-stage evidentiary hearing under the Post-Conviction Hearing Act (Act)

(725 ILCS 5/122-1 *et seq*. (West 2022), the trial court granted defendant Edward Pleasant's

petition and remanded the cause for a new trial. The State timely appealed and now claims the

court did not know or apply the correct legal standards, thus granting the new trial in error. We

agree.

¶ 2                                   BACKGROUND

¶ 3     Following a jury trial, defendant was found guilty of first degree murder and attempted

first degree murder, then sentenced to 46 years in prison. His conviction was affirmed on direct

appeal, and he subsequently filed a petition under the Act, claiming *inter alia* that he was

actually innocent. See *People v. Pleasant*, 1-05-1588 (November 10, 2008) (unpublished order

under Illinois Supreme Court Rule 23). In 2022, following second-stage proceedings with

appointed counsel, the cause advanced to a third-stage evidentiary hearing before Judge William

H. Hooks, wherein a single witness, Michael Johnson, testified that defendant was not the

shooter.[1] The postconviction court issued an oral ruling granting a new trial, then denied the

State's motion to reconsider. In its ruling, the court made a number of comments about the legal

standards under which it was operating. For the sake of brevity, we address those comments

within the analysis section, as we consider the State's appeal.

¶ 4                                    ANALYSIS

¶ 5     The Act provides a procedural mechanism by which a criminal defendant can assert that

his federal or state constitutional rights were substantially violated in his original trial or

sentencing hearing. 725 ILCS 5/122-1(a) (West 2020); *People v. Davis*, 2014 IL 115595, ¶ 13.

The Act sets forth three stages of review for a petition. *People v. Domagala*, 2013 IL 113688, ¶

32. Where, as in this case, a defendant makes the requisite substantial showing that his

constitutional rights were violated at the second stage, he is granted a third stage evidentiary

hearing. *Id*. ¶ 34. There, "the circuit court serves as the fact finder, and, therefore, it is the court's

_____

[1]In the written order advancing the petition to the third stage, the trial court cited law regarding successive postconviction petitions instead of initial petitions. The court also made no determination as to the conclusive nature of the evidence, simply stating in reference to Johnson: "This court finds that petitioner could not have known the identity of this witness or his attorney at the time of trial and could not have been discovered through due diligence. Therefore, this claim is advanced to the third stage."

function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *Id*. At this stage, the circuit court must determine whether the evidence introduced demonstrates that the petitioner is, in fact, entitled to relief. *Id*.

¶ 6      Here, defendant claimed that he was actually innocent of the crimes and therefore had to establish that the evidence was newly discovered, material and not cumulative, and of such a conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Edwards*, 2012 IL 111711, ¶ 32. Evidence is conclusive, when it, considered along with the trial evidence, would probably lead to a different result. *Robinson*, 2020 IL 123849, ¶ 47.

¶ 7      Trial courts are presumed to know and follow the law, unless the record demonstrates otherwise. *In re Commitment of Snapp*, 2021 IL 126176, ¶ 22; *In re Jonathon C.B.*, 2011 IL 107750, ¶ 72. The State argues this is one such case, and we agree. Although the State maintains the standard of review is manifest weight, whether a court applied the proper legal standard is a question of law that warrants *de novo* review. *People v. Campos*, 349 Ill. App. 3d 172, 176 (2004); see also *People v. Morgan*, 2025 IL 130626, ¶ 22 (discussing the *de novo* standard). Here, the record shows, first, that the trial court did not understand that the remedy for an actual innocence claim was a new trial. See *People v. Carter*, 2013 IL App (2d) 110703, ¶ 75. As defense counsel argued in closing that the evidence was conclusive, the court interjected: "I think you're making [an] argument now for a new trial," to which counsel stated, "Yes, Judge." The court continued, "I thought you started off by saying that you were purs[u]ing - - I thought - - maybe I misunderstood you. I thought you were pursuing actual innocence." Defense counsel clarified that proving actual innocence doesn't result in an acquittal, but rather, a new trial. Following evidence and argument, the court continued: "*this Court is not prepared to make any*

*declaration concerning actual innocence at all*. This Court is in a position to set a new trial. *Actual innocence is not required for that new trial* and this Court is - - when I say that, I say that very strongly. I'm not prepared in any way whatsoever in terms of suggesting actual innocence." (Emphasis added).

¶ 8      Second, the aforementioned statements and others demonstrate that the trial court declined to decide the matter of actual innocence, and further, misunderstood or misapplied the law regarding actual innocence. This was true specifically as to the conclusive character of the evidence. The court declared:  "this Court is not willing to substitute my judgment for the judgment of possibly a jury who has to look at this multi-level - - multi-layered proceeding that took place before one of my colleagues but more importantly before a jury years ago." The court also suggested it was *not permitted* to make a credibility determination ("I would have to make a credibility determination as a jury of one to suggest that nothing raised by petitioner has the probability of having a different result if a different jury from the first jury were to hear the case").

¶ 9      Contrary to the court's statements, third-stage hearings and actual innocence claims expressly involve credibility determinations that are uniquely appropriate for trial judges. *People v. Coleman*, 2013 IL 113307, ¶ 97; see also *Morgan*, 2025 IL 130626, ¶ 38 ("the reviewing court never has the full benefit of hearing and observing the witnesses' testimony"); *cf. People v. House*, 2023 IL App (4th) 220891, ¶ 76-77 (noting that by contrast, at the first and second stages of postconviction review, a trial court does not engage in any credibility or fact-finding determinations). Here, the trial court was tasked with determining whether Johnson — who had been convicted of home invasion, thrice convicted of aggravated battery of a police officer, who previously had lived in the same building as defendant, and who had written his affidavit in 2009

4

after being housed in the same prison facility with defendant — was credible when he claimed that he did not see defendant during the shootout and that one of the shooters was, in fact, a main witness (P Diddy/Lorenzo Thomas) for the State at trial.[2] The court also had to assess Johnson's credibility when he testified that he saw defendant elsewhere just after the shooting, even though Johnson omitted that detail from his 2009 affidavit and, according to the State, this conflicted with alibi evidence offered at trial.[3]

¶ 10     The court then had to determine whether a new jury would probably reach a different result after considering all the new evidence along with the prior evidence. See *Robinson*, 2020 IL 123849, ¶ 48; *Coleman*, 2013 IL 113307, ¶ 97 (probability, not certainty, is the key). Indeed, at the third-stage evidentiary hearing, the burden of proof is on the defendant to show he was denied a constitutional right by a preponderance of the evidence. *Coleman*, 2013 IL 113307, ¶ 92; *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Yet, the court failed in those specific regards, notwithstanding the parties' arguments reciting the appropriate law. In addition, the court incorrectly stated that the standard of review was an abuse of discretion, rather than whether the evidence was against the manifest weight, and further stated: "It causes me pause to leave the situation as it is," before ordering a new trial. See *Coleman*, 2013 IL 113307, ¶ 98. As set forth, that is not the standard for actual innocence.

¶ 11     Last, the record indicates the court misunderstood what stage of postconviction review was before it. The court stated: "For the purpose of this proceeding the issues raised by the

---

[2]The State entered into evidence two certified copies of conviction, one showing Johnson was convicted of home invasion and sentenced to 10 years in prison, and another showing he was convicted of aggravated battery of a police officer and sentenced to 5.5 years in prison. Johnson stated on cross that he had been convicted three times of aggravated battery of a police officer.

[3]We note that in Ottinyse Brown's affidavit, attached to defendant's postconviction petition, she placed defendant in a different location around the time of the shooting than Johnson, the witness testifying at defendant's third-stage hearing.

petitioner are too serious for this Court to *summarily deny* his right to a new trial." (Emphasis added). However, summary dismissal of the claim occurs only at the first stage of review. See *People v. Hatter*, 2021 IL 125981, ¶¶ 23-24.

¶ 12    The foregoing contradicts the presumption that courts know and follow the law. *Cf. People v. Montes*, 2024 IL App (2d) 230453-U, ¶¶ 41-42 (finding the court knew the law and applied the correct standard following the defendant's third-stage actual innocence evidentiary hearing); Ill. S. Ct. R. 23(e) (eff. Feb. 1, 2023) (an unpublished order may be cited for persuasive purposes). As such, whether we apply a *de novo* or manifest weight standard of review, the court clearly committed plain, evident, and indisputable error. See *Coleman*, 2013 IL 113307, ¶ 98; *Carter*, 2013 IL App (2d) 110703, ¶ 76. Notably, the actual innocence standard is extraordinarily difficult to meet and such claims are rarely successful. *Coleman*, 2013 IL 113307, ¶ 94; *Edwards*, 2012 IL 111711, ¶ 32. Given that fact, it's essential that the court's oral and written determination properly reflect the law.

¶ 13    Moreover, defendant committed the offense in August 2001, he went to trial in 2004, he filed his postconviction petition in December 2009, and the order advancing the petition at second-stage proceedings was issued in 2020. The third-stage evidentiary hearing then took place in 2022. Two years later, in 2024, a different judge, Jennifer F. Coleman, denied the State's motion to reconsider even though she agreed with the State that there was no prior "specific finding that the petitioner had met [his] burden of all the requirements of actual innocence," and stated that the prior ruling was "very unclear." Meanwhile one of the alleged shooters ("Cold Pepper") died in 2004, and defense counsel stated that the complaining witness, Milton Alexander, also had died. In this case, granting a new trial based on an actual innocence claim is

a serious remedy given the passage of time and witnesses' deaths. Such a remedy requires appropriate consideration.

¶ 14     In closing, we note that the dissent prematurely addresses matters that are purely within the realm of the postconviction court and does so in violation of our Supreme Court Rules, which require that written orders (and, *ergo*, dissents) be "concise" and "succinctly state" the "germane facts," issues, contentions, and decision. See Ill. S. Ct. R. 23(b) (Feb. 1, 2023). The dissent also declines to follow the law or properly rely on legal authority, contrary to our mandate. See *Snapp*, 2021 IL 126176, ¶ 22; *Jonathon C.B.*, 2011 IL 107750, ¶ 72.

¶ 15                                         CONCLUSION

¶ 16     We therefore reverse and remand this case for a new third-stage evidentiary hearing under the Act. See *People v. Robinson*, 2021 IL App (1st) 171371, ¶ 58. We express no opinion on the merits of defendant's postconviction claim. On remand, defendant will have the opportunity to amend his postconviction petition and present evidence anew. Given the passage of time in this case, the parties and the court should act expeditiously on remand.

¶ 17     Reversed and remanded.

¶ 18     Justice Pucinski, dissenting.

¶ 19     The majority's opinion raises concerns in both its approach and its conclusions. From the outset, the majority's selective recitation of background facts signals its conclusion, shaping the narrative in a way that constrains the legal analysis. Accordingly, I begin my dissent with a more comprehensive account of the relevant facts to ensure the reader has a fuller understanding of the case and the foundation for my disagreement with the majority. That my dissent is necessary at all demonstrates that the circuit court's decision was open to reasonable interpretation.

¶ 20                                         BACKGROUND

¶ 21            Trial Evidence

¶ 22     At trial, Alexander, a retired Black Disciples gang member, testified that he previously stayed with his sister at 2222 South State Street in Chicago's Ickes housing projects ("Ickes"), but lived at 4228 South Michigan at the time of trial. In the early morning of August 18, 2001, he left his sister's apartment in the 2222 building to visit his niece in the 2250 building. Morris, another resident of the 2222 building, accompanied him. He heard a few people warn against "go[ing] down to the lane" because there was going to be a "show shooting." He testified that "it didn't concern [him] because *** [he] wasn't no gang banger, so, I heard it's between the gangs." As Alexander and Morris crossed through the basketball court, the shooting started. They both dropped to the ground. Alexander yelled to Morris to crawl closer to him, but she did not respond. Her body was still except for her arm, which was shaking. He crawled over to her and placed his leg over her body to pull her. In the process, he was shot in the foot. He did not know who shot him or where the shots came from.

¶ 23     An ambulance took Alexander to the hospital, where he spoke with a detective. He returned to his sister's apartment that evening and spoke with a detective and an assistant state's attorney. The detective showed him a photo array and he identified defendant as the shooter.  He also provided a written statement. He testified that some young men told him to identify defendant as the shooter. He stated that "one of them was the one that was here today," who he knew as "P-Diddy."[4] He thought P-Diddy's name might be Randolph but clarified that he knew him by P-Diddy. He testified that he knew defendant as "Doo-Doo" and he saw him around because

_____

[4] Lorenzo Thomas testified before Alexander.

defendant's girlfriend lived across from his niece. He also knew a person that went by the name of "Cold Pepper."

¶ 24    The State confronted Alexander with his written statement. He admitted that in his statement he identified defendant as the only shooter and stated the shots only came from the 2310 building. He testified that Randolph and his cousin were waiting in the hallway while he provided a detective and an assistant state's attorney with his statement. The State asked, "What about P-Diddy?" Alexander replied, "Yeah, he was in, he was at 51st." The State also confronted him with his grand jury testimony. He remembered that a detective brought three of them to the courthouse to provide grand jury testimony: himself, Randolph, and Pooky Dog. The State asked, "What about P-Diddy?" Alexander replied, "Yes, and his cousin too." They went into the grand jury one at a time. He agreed that he provided the following testimony to the grand jury: before the shooting, someone yelled at him to watch the 2310 building; he looked at 2310 and saw Doo-Doo at the back entrance holding a gun; Doo-Doo wore black jeans, a t-shirt, and a white do-rag; Doo-Doo aimed and fired the gun towards him and Morris; and Doo-Doo ran back into the 2310 building.

¶ 25    On cross-examination, Alexander clarified that Randolph and P-Diddy were the same person. P-Diddy was a member of the Gangster Disciples gang. He reiterated that the only reason he identified defendant as the shooter was because he was told to. He was drunk the night he was shot. The back entrance of the 2310 building was approximately 100 yards away from where he was shot. He told the detective at the hospital that he heard approximately three to four gunshots, and he did not know where the gunshots came from. He clarified that he knew at least one of the gunshots came from the 2240 building, which was directly in front of him. On redirect, Alexander admitted that he was high on drugs and drunk the night he was shot. On recross-examination,

Alexander reiterated that Randolph and others were in the front room of his apartment when he was questioned. They told him what to tell the detective and assistant state's attorney.

¶ 26    At trial, Lorenzo Thomas, a Gangster Disciples gang member, testified he lived at 2240 South State in Ickes. The State asked Thomas, "Now the Gangster Disciples that live in [these] buildings, do they all get along?" Thomas responded that they do now. However, in August 2001, they were at "war." He knew an individual named "Cold Pepper." On August 18, 2001, at approximately 2 a.m., he went out on the front porch of the 2250 building. He observed Alexander and Morris walking through the courtyard towards the 2240 building. The 2250 and 2240 buildings were one large, connected building. Thomas heard gunshots but did not see where they were coming from. He witnessed Morris and Alexander get shot. When the police arrived, Thomas approached them and told them he witnessed defendant shooting a firearm and running back into the 2310 building. He remembered hearing approximately seven gunshots.

¶ 27    The State confronted Thomas with his written statement and his grand jury testimony. In his written statement, he stated that he witnessed defendant walking toward the fire lane behind the 2310 building. He was afraid that defendant might shoot him because he socialized with people from the 2222 building. He ran up the stairs of the 2250 building and he heard gunshots from the direction he previously observed defendant. He walked outside of the 2250 building and witnessed defendant fire two more shots while running back into the 2310 building. At trial, he admitted that in his grand jury testimony he stated that defendant wore a white shirt, white do-rag, and black jeans on the night of the shooting. On cross-examination, Thomas admitted that he identified the shooter from 200 feet away.

¶ 28    Medical Examiner Tae Lyong An testified that Morris had two entry gunshot wounds and one exit wound. One entry wound was on the top right of Morris's head. Dr. An recovered the

bullet from the back left side of the brain. The other entry wound was on Morris's left elbow. The bullet exited through the other side. The exit wound was lower than the entry wound. The cause of death was multiple gunshot wound, laceration, brain. The manner of death was homicide. On cross-examination, Dr. An testified that the entry wounds could be consistent with bullets fired from a second story.

¶ 29    Officer Ryan Miller testified that he responded to a shooting at 2240 South State Street on August 18, 2001, at approximately 2:17 a.m. He observed Morris laying face down on a basketball court with a gunshot wound to the head. He spoke with Alexander who told him he observed the shooter come out the 2310 building and then run back inside. He observed numerous "youths" in the back of the 2222 building. While processing the scene, Thomas approached him and identified defendant as the shooter. On cross-examination, Miller testified that Alexander informed him that two individuals moved him from the basketball court to the sidewalk on State Street. Miller did not get an opportunity to interview them.

¶ 30    Detective Paulette Wright also testified that Thomas identified defendant as the shooter. Thomas described defendant as tall with a dark complexion. Defendant wore a white t-shirt with the sleeves cut off and a white bandana. On cross-examination, Wright stated that Thomas never informed her that he witnessed defendant shoot the gun. Rather, he heard the gunshots. Another individual was arrested at the scene but not defendant.

¶ 31    Forensic Scientist Tonia Brubaker testified that she evaluated the ballistics evidence recovered from the shooting on August 18, 2001. She determined that the bullets recovered were fired from two different firearms. She could not determine the age of the bullets recovered.

¶ 32    Detective Steven Kostecki testified that he collected several bullets and bullet fragments from the 2240 and 2250 buildings and the courtyard area. Detective Thomas Benoit testified that

forensic investigators found bullets and bullet fragments in front of the 2240 and 2250 buildings. He searched the 2310 building but did not find any evidence. He testified that Alexander and Thomas were in the police station at the same time to view the line-up. On cross-examination, he stated that he did not find any evidence around the 2310 building that indicated a shooting.

¶ 33 The defense called paramedic O'Neal Gray. Gray testified that he worked at the 2320 building which was a little southwest of the 2310 building and south of the 2250 building. He heard gunshots on August 18, 2001, at approximately 2:15 a.m. He heard approximately six gunshots in rapid succession. About a second later, he heard a second set of 5 gunshots. The first series of gunshots came from the area of the 2250 building. The second set of gunshots came from further north, from the area near the 2222 building.

¶ 34 The parties stipulated to the testimony of Dr. Nancy Badrot, who treated Alexander for a gunshot wound to his foot on August 18, 2001. She recalled that Alexander was uncertain of all events. He admitted to drinking and smelled of alcohol.

¶ 35 Sherise Smith testified that she was a resident of the 2320 South State Street building in Ickes. She knew defendant for approximately 5 to 6 years. In the early morning hours of August 18, 2001, she attended a birthday party for defendant's deceased brother at the Archer Courts development located at 21st and Princeton, which was approximately 10 to 12 blocks from Ickes. Smith estimated that walking to Archer Court from Ickes took approximately 20 to 25 minutes and driving took approximately 10 minutes. About 20 to 25 people attended the party. Defendant attended the party. She received a phone call at around 2 a.m. She observed defendant at the party after she received the phone call. She left the party after receiving the phone call. Although the circuit court sustained the State's hearsay objection to the content of the phone call, the jury heard multiple times that Smith learned from the phone call that there was a shooting at Ickes, and she

shared that information with the other partygoers. After she learned that defendant was arrested for the shooting, she informed police officers about defendant's whereabouts during the shooting. On cross-examination, she admitted that she did not know what time defendant left the party.

¶ 36        Postconviction Proceedings

¶ 37    In 2009, defendant filed a *pro se* postconviction petition wherein he asserted a claim of actual innocence and other claims. He attached the affidavits of Tamikyo Johnson, Naketta Mitchell, and Ottinyse Brown, who stated that defendant was with them at a party until 2 a.m. Brown stated that at 3:06 a.m., defendant accompanied her to her room at Ickes and left immediately afterward.[5] Police were already present at Ickes, and an officer questioned defendant about his whereabouts when they entered the 2310 building.

¶ 38    Defendant's petition also attached the affidavit of Michael Johnson. Johnson averred he was an eyewitness to the shooting on August 17, 2001. He saw Anthony White, whom he knew as Cold Pepper, standing near the 2240 building and shooting a gun at Thomas, whom he knew as P-Diddy or Prince. Thomas stood in front of the 2250 building and shot back at White. A third shooter shot at Thomas from the front of the 2222 building. In between the three shooters, there was a basketball court where Alexander and a woman were walking. The woman died from a stray bullet. Alexander was shot but lived. Johnson averred that defendant was not one of the shooters. Johnson saw the police arrest Thomas, so he assumed that they charged Thomas with the shooting.

---

[5] The majority concludes that Brown's affidavit is inconsistent with Johnson's testimony. *Supra* note 3. However, Johnson testified that he left his friend's house around 2:00 to 3:00 a.m. *Infra* ¶ 40. As he left his friend's house, he witnessed the shooting. *Infra* ¶ 40. Based on his testimony, he stuck around until the police arrived and arrested someone. *Infra* ¶ 40. Detective Wright testified that an individual was arrested the night of the shooting. *Supra* ¶ 28. Accordingly, there is no inconsistency between Johnson's testimony and Brown's affidavit. If defendant left Brown at 3:06 a.m. and Johnson stayed until an arrest was made, it is entirely reasonable that defendant was already at the Tiki House when Johnson arrived.

¶ 39    The circuit court appointed counsel and advanced the petition to the second stage. In 2016, postconviction counsel filed a supplemental petition and a Rule 651(c) certificate. In 2018, postconviction counsel filed an amended supplemental petition. In 2020, in a written order, the circuit court stated "In examining petitioner's claim of actual innocence, this court follows the requirements laid out in *Washington* that 'the supporting evidence be new, material, noncumulative and, most importantly, "of such conclusive character" as would "probably change the result on retrial." ' " The court subsequently concluded, "This matter of actual innocence will be advanced to a third stage hearing." The circuit court advanced defendant's actual innocence claim to a third-stage evidentiary hearing and dismissed the other claims.

¶ 40    In 2022, at the third-stage evidentiary hearing, postconviction counsel stated in his opening statement, "But you are going to hear today from Mr. Johnson to be able to judge not only credibility, but the believability of his testimony and how relevant it is to the issue of whether or not [defendant] should be granted a new trial."[6] The State noted in its opening statement:

> "Judge, the only thing that I would say, as your Honor knows, there's the three factors for actual innocence, which is the only issue that we are here for: Newly-discovered material, non-cumulative, and conclusiveness. And your Honor knows that in order for the petitioner to get a new trial, you have to judge the credibility of Mr. Johnson and take his testimony that he's going to give you today and compare it to the testimony that was given to the jury in 2004 and 2005—around that time—and decide whether a new trial is justified.
>
> At all times in this [postconviction] hearing, it's the burden of the petitioner to meet each and every one of those criteria for your Honor to grant this new trial. And I believe that once you hear Mr. Johnson's testimony, that they will not be able to meet that burden, and that your Honor will deny the [petition]."

---

[6] In 2009, Defendant filed his postconviction petition, which included Johnson's affidavit. Defendant's petition remained pending for over a decade before advancing to a third-stage evidentiary hearing in 2022. This delay is a significant concern.

¶ 41    The circuit court asked postconviction counsel and the State whether they agreed that the standard of proof was a preponderance of the evidence. Both acknowledged that this was the correct standard of proof. Postconviction counsel then called Johnson to testify.

¶ 42    Johnson testified that he somewhat remembered August 18, 2001. Around midnight, he was at a friend's home at the Ickes Homes. Around 2:00 to 3:00 a.m., he left his friend's home and headed to the Tiki Room. On his way to the Tiki Room, he witnessed a shootout near 22nd and State Street. The shooters were Thomas, Cold Pepper, and a third person. Johnson did not know the third person. He testified that the third shooter could not have been defendant because the shooter was shorter in stature and had a lighter complexion than defendant. When Johnson left the Ickes Homes, it seemed to him that the police were taking Thomas into custody. He arrived at the Tiki Room, and he noticed defendant was already there. Johnson was at the Tiki Room for a few hours. He observed defendant intermittently throughout the night. When he left the Tiki Room, defendant was still there.

¶ 43    On cross-examination, Johnson admitted that he had one conviction for home invasion and three convictions for aggravated battery of a peace officer. He was housed with defendant while incarcerated in 2009. They spoke about each other's cases. Johnson told defendant that he witnessed the murder for which defendant was incarcerated. He wrote an affidavit for defendant in 2009. He did not remember how many gunshots were fired nor what the shooters wore. Johnson had known defendant and his family for many years, since they lived in the same neighborhood. He did not remember whether he mentioned the Tiki Room when an assistant state's attorney interviewed him in 2016. He did not mention the Tiki Room in his affidavit. The Tiki Room was a block or two from Ickes Homes. He did not mention seeing defendant before or after the shooting in his affidavit.

¶ 44    The State asked Johnson, "In the general home area, where exactly did this shooting take place?" Johnson responded, "Well, 2240 is a building that sits off State Street. 2240 State Street, there's a lane which they call a fire lane, which separates the building from the main street, and then it's a basketball court. Like it's 22nd and State, right there." He clarified that the basketball court was on the side of the 2222 building. He stated, "It happened—the shooting happened in front of 2240. And on the front of 22—it was three different people. So it was 2240, 2250 and 2222."

¶ 45    On redirect, Johnson agreed that the shooting happened approximately 21 years ago. He wrote the affidavit approximately 12 years ago and he spoke with an assistant state's attorney approximately six years ago. When he wrote his affidavit, he described what he remembered at that time. He did not include everything that happened in the affidavit. Rather, he only concentrated on the shooting in his affidavit. He clarified that the shooting took place "In the morning, late night August 17th in the morning***." The first time someone asked him where he went after the shooting was after he wrote his affidavit. While he did not know how long the shooting lasted, it did not last a very long time. He did not contact the police because he did not want to get involved and complicate his life. He was afraid of Cold Pepper.

¶ 46    On recross-examination, Johnson agreed that his observation of defendant in the Tiki Room would have been an important fact to note in his affidavit. He thought he shared that fact with the assistant state's attorney when he was interviewed. He told the assistant state's attorney that Cold Pepper died in 2004. On further redirect, Johnson stated that he would not commit perjury for defendant.

¶ 47    The parties stipulated that to perfect impeachment, the State would have called former Cook County Investigator Daniel Brannigan to testify. Brannigan would have testified that he

interviewed Johnson on December 30, 2016. Johnson told Brannigan that the shooting occurred in the fire lane in the early morning hours of August 18, 2001. The shooter, Cold Pepper, died in 2004. He did not tell Brannigan that he observed defendant at the Tiki Room after the shooting. He was not asked by Brannigan what he did after the shooting or whether he saw defendant after the shooting.

¶ 48    During closing argument, defendant's postconviction counsel argued:

> "As far as conclusion, I'll talk about that a little bit more but the standard, Judge, is that it has to be—it has to have been more likely than not that this would have changed the result. You don't have to be absolutely convinced that a jury would have found him not guilty, just that probably based on this testimony of Mike Johnson they would have found him not guilty.
>
> ***
>
> Judge, the question here really is would it have raised a reasonable doubt in the jurors' minds. More likely than not. Would it probably have raised reasonable doubt, not that it would have convinced them he was innocent but would Michael Johnson's testimony have raised reasonable doubt. Now, there are a couple of reasons—"

The circuit court interjected, "I think you're making [an] argument now for a new trial." Postconviction counsel responded, "Yes Judge." The court inquired, "I thought you started off by saying that you were pursuing—I thought—maybe I misunderstood you. I thought you were pursuing actual innocence." Postconviction counsel replied, "Actual innocence for a new trial, Judge. Actual innocence doesn't get you it being tossed. It gets you a new trial." The court responded, "Okay. Go ahead."

¶ 49    The State argued:

> "The case law is clear that conclusiveness is more important. Is his testimony of such conclusive nature that this Court would have to view the trial testimony in a way to discredit the jury's finding? That's where your Honor's credibility finding comes in as to Mr. Johnson. Was he credible? Was his testimony enough to give [defendant] a new trial? The Court doesn't sit as a third juror. But does his testimony put the trial testimony in such a different

light that a new trial is required? That's where they fall short. Because his testimony wasn't credible.

\*\*\*

Judge, as I indicated, Mr. Johnson did not testify credibly. And this Court knows the burden at a post-conviction, knows the requirements that the defense has to meet and that it's their burden at all times. I submit that they have not met their burden and I would ask that you deny the [petition]."

¶ 50    Following oral arguments, the circuit court provided an oral ruling:

"As to the proposition of actual innocence, this Court has—this Court is not prepared to make any declaration concerning actual innocence at all. This Court is in a position to set a new trial. Actual innocence is not required for that new trial and this Court is—when I say that, I say that very strongly. I'm not prepared in any way whatsoever in terms of suggesting actual innocence.

The issues raised by the petitioner in this case cause pause. The reaction to the issues raised by the State are well articulated by the State, makes sense, but this Court is not willing to substitute my judgment for the judgment of possibly a jury who has to look at this multi-level—multilayered proceeding that took place before one of my colleagues but more importantly before a jury years ago. Court will go so far as to say this Court would be callous and the Court may be engaged in an abuse of discretion, I'll go that far, to not allow a new trial.

\*\*\*

What has not changed is if a Court has pause with respect to leaving matters as they were, I would have to make a credibility determination as a jury of one to suggest that nothing raised by petitioner has the probability of having a different result if a different jury from the first jury were to hear the case, if a different set of attorneys for the defendant were now allowed the possibility of using the testimony of the newly discovered witness, which the State takes objection to as the definition of newly discovered.

For the purpose of this proceeding, the issues raised by the petitioner are too serious for this Court to summarily deny his right to a new trial.

\*\*\*

It causes me pause to leave the situation as it is, therefore a new trial is ordered over the objection of the State."

¶ 51    Following the circuit court's ruling, the State filed a motion to reconsider. Postconviction counsel filed a response. At a hearing on the motion to reconsider, the circuit court stated, "Obviously, I granted, as I should have, the reconsideration, but the Court will review and see whether the proper language was used and the meaning of the language I did use. The parties deserve a clarification, and I will give them a clarification."

¶ 52 The judge who presided over the hearing, Hon. William H. Hooks, retired prior to ruling on the State's motion to reconsider. A different judge, Hon. Jennifer F. Coleman, denied the motion. Judge Coleman noted, "It's very unclear to this Court exactly what Judge Hooks' ruling was based on." Nevertheless, Judge Coleman stated that she would deny the State's motion to reconsider because she did not observe Johnson's testimony, as Justice Hooks had. The State appealed.

¶ 53                 APPLICABLE LAW

¶ 54 "Absent an affirmative showing of error in the record, a trial judge is presumed to know the law and to apply it properly." *People v. Henderson*, 336 Ill. App. 3d 915, 922 (3rd Dist. 2003). "Whether the trial court applied the proper legal standard is a question of law, which is subject to *de novo* review." *People v. Campos*, 349 Ill. App. 3d 172, 176 (2nd Dist. 2004).

¶ 55 The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2018)) provides a mechanism by which criminal defendants may assert that a substantial denial of their constitutional rights resulted in their conviction. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). If the petition makes a substantial showing of a constitutional violation, the matter proceeds to a third-stage evidentiary hearing on the merits of petitioner's claims. *People v. Johnson*, 206 Ill. 2d 348, 357 (2002). In this case, defendant's actual innocence claim advanced to a third-stage evidentiary hearing. See 725 ILCS 5/122-6 (West 2008). At a third-stage hearing, the defendant bears the burden of showing a deprivation of his constitutional rights by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 56 At a third-stage hearing, "the circuit court serves as a fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34. In fulfilling this responsibility, the court is not required to make explicit findings or address which

19

evidence it found credible or not. *People v. Carter*, 2021 IL App (4th) 180581, ¶ 77; *People v. House*, 2023 IL App (4th) 220891, ¶ 105. This follows because the circuit court obligations at a third-stage evidentiary hearing are no greater than those at a bench trial. *Id*. In a bench trial, the trial court also serves as the finder of fact and is therefore responsible for resolving alleged inconsistencies and conflicts in the evidence, weighing the testimony, and assessing the credibility of the witnesses. *People v. Bannister*, 236 Ill. 2d 1, 18 (2009).  Following a bench trial, the trial court *may* comment on the credibility of the witnesses. (Emphasis added.) *People v. Kennedy*, 191 Ill. App. 3d 86, 91 (1st Dist. 1989); *People v. Heiman*, 286 Ill. App. 3d 102, 112 (1st Dist. 1996); see also *People v. Conway*, 2023 IL 127670, ¶ 23.

¶ 57    After a third-stage hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. We review for manifest error because the postconviction court's observation and hearing of witness testimony positions it far better to ascertain the truth than a reviewing court that relies solely on the printed record. *People v. Coleman*, 183 Ill. 2d 366, 384 (1998). "Manifest error is 'clearly evident, plain, and *indisputable*." (Emphasis added.) *Coleman*, 2013 IL 113307, ¶ 98 (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98.

¶ 58    "To succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *Coleman*, 2013 IL 113307, ¶ 96. "[T]he conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *People v. Robinson*, 2020 IL 123849, ¶ 47. The question is whether the evidence places the evidence

presented at trial in a different light and undercuts the court's confidence in the initial verdict. *Coleman*, 2013 IL 113307, ¶ 97. The evidence need not be entirely dispositive. *Id.*

¶ 59　"In Illinois, a postconviction actual-innocence claim is just that—a postconviction actual innocence *claim*." (Emphasis added.) *Coleman*, 2013 IL 113307, ¶ 91. "[A] trial court should not redecide the defendant's guilt in deciding whether to grant relief." *Id*. ¶ 97. If this were so, the remedy would be an acquittal, not a new trial." *Id*. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Robinson*, 2020 IL 123849, ¶ 48.

¶ 60　　ANALYSIS

¶ 61　A reviewing court typically follows a two-step inquiry: first, determining whether an error occurred, and second, assessing whether that error was prejudicial. In this case, the relevant "error" would be whether the State successfully rebutted the presumption that the circuit court knew and correctly applied the law. The "prejudice" inquiry would then turn on whether the newly discovered evidence is of such conclusive character that it would likely alter the outcome on retrial. These two inquiries, however, should not be viewed in isolation. If this court concludes that the new evidence is sufficiently compelling to change the result on retrial, that very conclusion necessarily informs whether the circuit court properly understood and applied the law in the first instance.

¶ 62　The majority fails to analyze whether the circuit court's oral decision is justified considering the facts. The majority's approach follows the same pattern throughout: it quotes the circuit court's comments and then summarily concludes that those comments must mean that the circuit court misapplied the law. This approach does not withstand scrutiny.

¶ 63    Again, "[a]bsent an affirmative showing of error in the record, a trial judge is presumed to know the law and to apply it properly." *Henderson*, 336 Ill. App. 3d at 922. Accordingly, the State bears the burden of affirmatively demonstrating that the circuit court was unaware of the nature of the proceedings and misapplied the law. It is through this presumption that this court must view the circuit court's comments. The record makes clear that the circuit court's comments correctly restated the standards at issue and demonstrated that the circuit court appropriately considered the impact of the new evidence and how it might be interpreted by a new jury at a new trial. Accordingly, for the reasons set forth below, the State has failed to make an indisputable showing that the circuit court misapplied the law or misunderstood the nature of the proceedings. To conclude otherwise would be unreasonable.

¶ 64    Both parties cite the Second District's unpublished decision in *People v. Montes*, 2024 IL App (2d) 230453-U as persuasive authority. In *Montes*, the State similarly argued that the circuit court applied the wrong standard. *Id.* ¶ 39. In particular, the State took issue with the court's statement: " 'I will say while I think there are a lot of problems with [affiant's] affidavit and what he testified to and so forth, I cannot say that his credibility is so poor that a jury is not entitled to hear what he has to say.' " *Id.* The State argued that the court's statement indicated that it applied the wrong standard and found the affiant incredible. *Id.* The Second District in *Montes* determined that the record showed that the circuit court was aware of its role at the third-stage hearing to make credibility determinations based on the record. *Id.* ¶ 41. The Second District noted that on multiple occasions, the parties reminded the court of its role as a fact finder. *Id.*

¶ 65    Here, the parties on multiple occasions emphasized to the circuit court its role as the fact finder and its function to determine witness credibility. *Supra* ¶¶ 38, 47. Similarly, the parties underscored the proper standard at multiple instances throughout the proceedings. *Supra* ¶¶ 38,

46-48. Contrary to the majority's analysis, the court's statements regarding actual innocence demonstrated that it applied the correct standard. *Supra* ¶ 6. The court was correct in declaring that it was "not prepared to make any declaration concerning actual innocence at all," or "not prepared in any way whatsoever in terms of suggesting actual innocence." Following a third-stage evidentiary hearing, "the trial court should not redecide the defendant's guilt in deciding whether to grant relief." *Coleman*, 2013 IL 113307, ¶ 97 (citing *People v. Molstad*, 101 Ill. 2d 128, 136 (1984) ("this does not mean that [the defendant] is innocent, merely that all of the facts and surrounding circumstances * * * should be scrutinized more closely to determine [his] guilt or innocence")).

¶ 66      The majority also takes issue with the circuit court's comments that "it causes [the court] pause to leave the situation as it is." *Supra* ¶ 9. The majority contends that this statement further indicates that the circuit court applied an improper standard. The idiom "give (someone) pause" means "to cause (someone) to stop and think about something carefully or to have doubts about something." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/give-someone-pause (last visited January 22, 2025). Again, the court's statement falls squarely within the standard articulated in *Coleman*, that is, "whether [the newly discovered] evidence places the evidence presented at trial in a different light and *undercuts the court's confidence in the factual correctness of the guilty verdict*." (Emphasis added.) *Coleman*, 2013 IL 113307, ¶ 97. While the circuit judge may have used unusual phrasing, his intent was clear.

¶ 67      The majority also concludes that the circuit court declined to make credibility determinations since the court did not make *explicit* credibility determinations. *Supra* ¶ 7. Notably, the State cites *People v. Carter*, 2021 IL App (4th) 180581, ¶ 77 and concedes that a court "is not

23

required to make and explicit findings or discuss what evidence it found credible or not credible." Moreover, the circuit court's decision to grant a new trial inherently reflects a credibility determination. At the third stage, the court has only two options: grant relief or deny the postconviction petition. By choosing a new trial, the court necessarily assessed the witness's credibility alongside the trial evidence and determined that defendant proved by a preponderance of the evidence that the newly discovered evidence was significant enough to warrant reconsideration of the verdict.

¶ 68    In reaching its conclusion, the majority highlights the circuit court's statement, "I would have to make a credibility determination as a jury of one to suggest that nothing raised by petitioner has the probability of having a different result if a different jury from the first jury were to hear the case, if a different set of attorneys for the defendant were now allowed the possibility of using the testimony of the newly discovered witness***." In highlighting this statement, the majority ignores that the State made a similar comment in its closing argument when it informed the circuit court that "[it does not] sit as a Third Juror." Regardless, the circuit court's statement recognizes that its role following the third-stage evidentiary hearing was to determine whether there was a probability that a new jury, when presented with the new evidence, would reach a different conclusion than the first jury. See *Robinson*, 2020 IL 123849, ¶ 48. If, after a third-stage evidentiary hearing, the court were expected to act as the sole juror, it would be acquitting the defendant rather than ordering a new trial, as this would require the court to redecide the defendant's guilt. *Coleman*, 2013 IL 113307, ¶ 97. Furthermore, although encouraged and considered best practice, the circuit court is not required to make explicit credibility findings. *Carter*, 2021 IL App (4th) 180581, ¶ 77.

¶ 69    The majority also points to the circuit court's use of the word "summarily" and argues that somehow the circuit court believed that it was at first-stage proceedings. *Supra* ¶ 10. At first-stage,

a *pro se* postconviction petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis in either law or fact. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). This point alone raises serious doubts about the majority's argument. During both opening and closing arguments, the parties emphasized the appropriate standard and stage of the proceedings. The circuit court and both parties discussed the correct standard prior to Johnson's testimony, agreeing that defendant bore the burden of proving a deprivation of his constitutional rights by a preponderance of the evidence at a third-stage evidentiary hearing. Moreover, neither the State nor the public defender would participate in the proceedings if they were at the first stage. See 725 ILCS 5/122-4 (West 2008); *id.* § 122-5. The circuit court had already issued a comprehensive written order setting the case for a third-stage evidentiary hearing. Most notably, live testimony was presented, which may only occur at the third stage. See *id.* § 122-6. The majority's analysis addresses none of these points.

¶ 70    At the outset of this analysis, it was noted that the questions of whether the circuit court knew and correctly applied the law and whether the newly discovered evidence is of such conclusive character that it would likely alter the outcome on retrial are interrelated. This is the case because "[i]t is the judgment and not what else may have been said by the lower court that is on appeal to a court of review." *Rodriguez v. Sheriff's Merit Comm'n of Kane Cnty.*, 218 Ill. 2d 342, 357 (2006) (quoting *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983)). The reviewing court "is not bound to accept the reasons given by the trial court for its judgment" (*Rodriquez*, 218 Ill. 2d at 357 (quoting *Material Service Corp.*, 98 Ill. 2d at 387)), and "can sustain the decision of the circuit court on any grounds which are called for by the record, regardless of whether the circuit court relied on the grounds and regardless of whether the circuit

court's reasoning was correct" ((Internal quotation marks omitted.) *Rodriquez*, 218 Ill. 2d at 357 (quoting *Bell v. Louisville & Nashville R.R. Co.*, 106 Ill. 2d 135, 148 (1985))).

¶ 71    To be clear, the record firmly supports the presumption that the circuit court knew and correctly applied the law. Additionally, the conclusive character of the newly discovered evidence supports that conclusion and provides an independent basis for affirming the result. Assuming, *arguendo*, the circuit court's reasoning was inconsistent, that would not detract from our role in reviewing the ultimate decision, regardless of the correctness of all its stated reasoning. See *Rodriquez*, 218 Ill. 2d at 357. Rather than address this point, the majority instead chooses to comment on the length of this dissent and cites Illinois Supreme Court Rule 23(b) (eff. Feb. 1, 2023), which has no bearing on the analysis. That criticism is unworthy of further response. The analysis now turns to whether Johnson's testimony was of such conclusive character that it would probably change the result on retrial.

¶ 72    In our prior order in this case, our sufficiency of the evidence analysis relied on Alexander and Thomas's recanted testimony. People v. Pleasant, No. 1-05-1588 (2008) (unpublished order under Illinois Supreme Court Rule 23). We noted that "[t]he only time either Thomas or Alexander failed to give detailed accounts of the shooting was in the presence of the defendant at trial." Id. In essence, our prior order implied that Thomas and Alexander feared defendant. Johnson's testimony now provides an alternative explanation.

¶ 73    At trial, Alexander consistently testified that Thomas told him to identify defendant as the shooter. He further testified that Thomas was a constant presence when he provided statements to the police and that, at the time, he lived with his sister in Ickes. At the time of trial, Alexander no longer lived at Ickes. A plausible explanation is that Alexander feared Thomas and Cold Pepper and only changed his testimony once he felt safe. Additionally, Thomas would have benefitted

from Defendant's conviction. By securing defendant's incarceration, Thomas not only avoided prosecution himself but also eliminated a rival gang member. Thomas admitted at trial that the Gangster Disciples were at "war" with one another and that his faction opposed defendant's. Johnson's testimony, which identified at least two Gangster Disciples as shooters, provides a plausible alternative theory to the one presented at trial.

¶ 74 Detective Wright testified that, at the scene, Thomas stated he did not see defendant discharge a firearm. However, in his subsequent written statement and grand jury testimony, he claimed he saw defendant discharge a firearm while running into the 2310 building. Alexander did not identify defendant as the shooter at the scene. In fact, Dr. Badrot stated that Alexander was uncertain of all events and smelled of alcohol when she treated him at the hospital. Alexander later admitted he was drunk and high. Yet, the next day, he identified defendant as the shooter and provided a detailed description of his attire.

¶ 75 At trial, Alexander testified that at least some of the gunfire came from the 2240 building. Thomas testified that he was on the front porch of the 2250 building during the shooting. The 2250 and 2240 buildings were connected. Johnson testified that two of the shooters, Thomas and Cold Pepper, fired from the 2240 and 2250 buildings, while a third shooter fired from the 2222 building. This testimony aligns with Gray's account at trial, where he stated that he heard gunfire coming from the 2250 and 2222 buildings. The police recovered ballistic evidence from the 2240 and 2250 building, and the courtyard. They did not recover any ballistic evidence from the 2310 building. There was evidence of two firearms presented at trial. The medical examiner testified that Morris sustained gunshot wounds on both sides of her body, with trajectories indicating that the bullets entered from an elevated position. Yet, according to Thomas, defendant fired from ground level approximately 100 yards away.

¶ 76    In our prior decision, we noted that the evidence in this case was "closely balanced." *People v. Pleasant*, No. 1-05-1588 (2008) (unpublished order under Illinois Supreme Court Rule 23). Johnson's testimony not only exposes inconsistencies in the trial evidence but further tips the scales in favor of a different result. Johnson's testimony places the trial evidence in a different light, undermines confidence in the initial verdict, and the opposite conclusion is not clearly evident. Accordingly, the circuit court's decision to grant a new trial was not *manifestly erroneous*.

¶ 77    The flaws in the majority's reasoning are particularly glaring given the standard of review. As previously stated throughout this dissent, the circuit court's ruling is reviewed under the manifest error standard. "Manifest error is 'clearly evident, plain, and *indisputable*." (Emphasis added.) *Coleman*, 2013 IL 113307, ¶ 98 (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). Additionally, the circuit court's ruling carries a presumption that it knew and correctly applied the law. *Henderson*, 336 Ill. App. 3d at 922 ("Absent an affirmative showing of error in the record, a trial judge is presumed to know the law and to apply it properly."). Considering the presumption that the circuit court knew and correctly applied the law, the highly deferential manifest error standard, and the impact of the new evidence on the trial evidence, the majority's conclusion is unpersuasive. If reasonable minds can disagree about the circuit court's decision, then, it is not manifestly erroneous. The necessity of this dissent, along with the fact that two members of this court have reached the opposite conclusion, demonstrates that the circuit court's ruling was open to reasonable debate. Yet rather than adhere to this deferential standard, the majority substitutes its own judgment for that of the circuit court.

¶ 78    The majority's reasoning raises concerns. The majority appears to believe that the circuit court did not make credibility determinations since they were not explicitly stated. The majority suggests that the appropriate course of action is to remand the case for a new hearing before a

different circuit court judge. However, in reaching this conclusion, the majority fails to cite a single case requiring a circuit court judge at a third-stage evidentiary hearing to make explicit credibility determinations. The absence of such authority raises the question of whether any such requirement exists at all. In fact, case law makes clear that explicit credibility determinations are not necessary. *Supra* ¶ 54.

¶ 79     The majority's opinion disregards all these points, despite their presentation in briefing, and fails to address any of them. Instead, as previously noted, the majority limits its analysis to the circuit court's comments and its interpretation of those comments. Even on its own terms, the majority's approach lacks support.

¶ 80     If, after considering this analysis, one questions how the majority reached its decision, the answer lies in ¶ 13 of its opinion. The majority appears concerned that, due to the passage of time, a new trial could lead to defendant's acquittal. The majority overlooks the long-standing principle in law that "it [is] better to let the crime of a guilty person go unpunished than to condemn the innocent." (Internal quotation marks omitted.) *Coffin v. U.S.*, 156 U.S. 432, 453-54 (1895). This fundamental principle reinforces the judiciary's role to ensure that, when an individual's liberty is at stake, the courts must do everything possible to hear all the facts in search of the truth.

¶ 81     The majority's reasoning suggests that it is deciding this case on an improper basis and applying the wrong legal standard. The defendant is required to establish only his *claim* of actual innocence by a preponderance of the evidence at this stage, not prove actual innocence itself. (Emphasis added.) *Coleman*, 2013 IL 113307, ¶ 91 ("In Illinois, a postconviction actual-innocence claim is just that—a postconviction actual innocence *claim*."). Yet the majority reasoning suggests it is holding him to the latter, more difficult burden. Because I believe the defendant has met the appropriate standard, I would grant him a new trial and would not base my decision on speculation

about the challenges of retrying him due to the passage of time. Contrary to the majority's conclusion, the record supports the circuit court's application of the law, not the majority's interpretation of it.